UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD EDWARD WORTHY,

        Plaintiff,

   v.

CITY OF BERKELEY, et al.,

        Defendants.

Case No. 20-cv-05558-EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Docket No. 38

### I.    <u>INTRODUCTION</u>

Plaintiff Richard Worthy sued the City of Berkeley and Berkeley Police Officers Hernan Villarroel, Nicholas Turney, and Kandi Walther (collectively, "Defendants") for damages stemming from an incident on July 11, 2019 when the officers detained Plaintiff for a mental health evaluation pursuant to Cal. Welf. & Inst. Code § 5150. Docket No. 1. Now pending is Defendants' motion for summary judgment as to all claims in the complaint.

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' motion.

### II.    <u>BACKGROUND</u>

A.   <u>Factual Background</u>

On July 11, 2019, at 5:41 p.m., Defendant Hernan A. Villarroel, an officer with the Berkeley Police Department, claims that he observed Plaintiff Richard Worthy at the University Avenue underpass at the intersection with 4th Street in Berkeley, CA. Docket No. 38-3 ("Villarroel Decl.") ¶ 3. Plaintiff is African-American and was 74-years-old at the time of the incident. Docket No. 42-1 ¶ 1. Officer Villarroel declares that he saw and heard Plaintiff

screaming near passersby while swinging a metal object in the air, which turned out to be a flute. Villarroel Decl. ¶ 4.  Officer Villarroel states he saw a woman with a stroller and also a man and woman that appeared to be together that were in close proximity to Plaintiff and that they seemed alarmed and hurriedly walked away from Plaintiff.  *Id.*

Plaintiff disputes Villarroel's account and testified at his deposition that he was he was on his typical daily walk in the neighborhood "blowing my flute and walking and singing, just blowing my flute and walking down the center of the parking strip."  Docket No. 42-8 ("Worthy Depo.") at 28:10-12.  He testified that no one was near him and no pedestrians were in the vicinity.  *Id.*

It is undisputed that Officer Villarroel decided to make contact with Plaintiff, and issued a radio broadcast request for additional cover officers.  Defendant Officer Nicholas A. Turney arrived at the scene as a backup officer, and, upon his arrival to the scene, began recording the interaction on his body camera.  Docket No. 39 ("Bodycam Footage").  When the footage begins, it shows that Defendants apprehended Plaintiff from behind on an empty street while pointing a weapon – apparently a taser – at him.  *See* Bodycam Footage at 00:00-00:20; *see also* Worthy Depo. at 42:25—43:01; *id.* at 47:21-24 ("I was told if I didn't put down my flute there were going to tase me. Really?  So I put the flute down.  I don't want to be tased.  I don't need that.").

Once the audio begins on the video footage, approximately thirty seconds into the recording, the viewer sees Plaintiff expressing dismay at being stopped by the officers, and stating, "All the people here have been genocided.  All of them.  All of the people right here.  There was an Indian village here."  Docket No. 42-6 ("Transcript") at 2.  He calls the officers "Nazis" and mimics them preparing to execute him, speaking from their point of view, "Hey, I'm going to shoot you."  *Id.* at 4; *id.* ("You're shooting us down like dogs in the street.").

The officers ask Plaintiff for his identification.  Transcript at 4.  Plaintiff initially declines to produce it, but after a few minutes, does so.  *Id.* at 5, 10.  Plaintiff expresses that he does not want to speak with the officers, and that he wants to continue on his walk.  *Id.* at 3-4.  As the officers repeatedly decline to allow Plaintiff to leave, Plaintiff becomes more frustrated and tells the officers to "get out of my way or take me to jail."  *Id.* at 4-5.  The footage shows an ebb and

flow between Plaintiff and the officers, shifting between name calling, conversation and even some bantering between them.  Plaintiff repeatedly asks permission to be released so he can finish his walk.  *Id.* at 4, 6, 7, 23-24.  While he was verbally oppositional and used profanities at the officers, Plaintiff is compliant with the officers' request to sit, produce his identification (over his objection) and to hand over his flute.

When the officers refuse to allow him to finish his walk, Plaintiff expresses his fear at being targeted on the basis of his race.  *Id.* at 7-8.  He expresses fear that the officers will shoot him "fifty fucking times."  *Id.* at 10.  Throughout the interaction, Plaintiff continues to express his desire to be released.  *See e.g., id.* at 15 ("[L]et me out of here."); 16 ("What am I being arrested for? What have I done to deserve this?").  The interaction continues with the parties at an impasse, until approximately the 10:30 mark of the video, when Defendant Officer Kandi Walther arrives to the scene, and the Defendants place Plaintiff in handcuffs.  Officer Villarroel tells Plaintiff, "You're not being arrested.  You're just being detained."  *Id.* 16.  The officers do not explain the basis for Plaintiff's detention at this time.  Plaintiff does not resist the handcuffing.  Plaintiff and Defendants speak to one another for approximately 28 minutes longer.  During this time, Plaintiff uses more profanities, calls Defendants Nazis, expresses fear that they will kill him, makes references to historical genocides, insults Defendants' intelligence, makes negative remarks that are racial and sexual in nature; he also answers Defendants' questions about his use of drugs and mental illness in the negative, and answers questions about his background as a homeowner in Berkeley and graduate of UC Berkeley.  His responses are coherent and he appears lucid.  *See generally* Bodycam Footage 11:00-39:00.  During this time, Plaintiff is handcuffed, sitting on the sidewalk, and makes no attempts to leave the scene or physically threaten the officers, himself or others.  He exhibits no physical aggression towards the officers.

The officers do not expressly state why they are detaining Plaintiff, until approximately 38-minutes into the video when Villarroel states, "I'm taking you for an examination by a mental health professional at Alta Bates" Hospital.  Footage Transcript at 45.  According to Officer Villarroel, there was a delay in finding available ambulance to transport Plaintiff to a nearby hospital for a mental health evaluation pursuant to Cal. Welfare and Institutions Code § 5150, so

1    after nearly forty minutes at the scene, Villarroel drove Plaintiff to the police station in order to be

2    transferred to a private ambulance.  Villarroel Decl. ¶ 15.

3         At the hospital, Plaintiff denied any acute complaints, denied any prior psychiatric

4    admissions or having ever been prescribed psychiatric medications.  Docket No. 42-3 ("Hospital

5    Report") at 1.  Plaintiff further stated that he felt well, denied any current drug or alcohol use and

6    requested to go home.  *Id.*  Plaintiff's psychiatric examination stated that his "behavior was

7    appropriate, his speech was normal, his thought content was normal, his thought process was

8    normal, his recent memory was intact, and his remote memory was intact.  His insight/judgment:

9    aware of condition.  His suicide risk assessment: low risk.  *Id.* at 3.  Plaintiff was observed in the

10   emergency department for several hours and was found "not to demonstrate any acute danger to

11   self or others. . . no indication for involuntary commitment."  *Id.* at 4.  His symptoms were noted

12   as "most consistent with mild psychosis."  *Id.*  Plaintiff tested positive for opiates and

13   cannabinoids in his urine.  *Id.* at 6.  No medications were prescribed, and plaintiff was "medically

14   cleared for discharge.  *Id.* at 5.

15   B.    Procedural History

16        On August 10, 2020, Plaintiff filed this action for damages stemming from Defendants'

17   detention of him pursuant to Cal. Welf. & Inst. Code § 5150.  Docket No. 1.  Plaintiff's Complaint

18   sets forth two Section 1983 claims and five state law tort claims as follows:

19            1.   Section 1983 – arrest without probable cause in violation of the Fourth Amendment

20            2.   Section 1983 – retaliatory arrest in violation of the First Amendment

21            3.   Assault and battery

22            4.   False arrest and false imprisonment

23            5.   Cal. Civ. Code § 51.7 – violence or threat of violence motivated by race.

24            6.   Cal. Civ. Code § 52.1 – violation of constitutional rights through threats,

25                 intimidation, and coercion

26            7.   Negligence

27   Now pending is Defendants' motion for summary judgment on all claims.  Docket No. 38.

28

*United States District Court*
*Northern District of California*

### III.     LEGAL STANDARD

A.     Motion for Summary Judgment (Rule 56)

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.[1]

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV.     ANALYSIS

A.     Plaintiff's Request for Continuance

As an initial matter, Plaintiff's opposition brief makes a passing reference argument that "Defendants' motion for summary judgment appears to be premature as the discovery cut-off has not yet occurred and due to Plaintiff's counsel's multiple fractures and recent health issues, Plaintiff's counsel respectfully requests additional time to complete discovery in this case." Opp. at 3-4.

Under Federal Rule of Civil Procedure 56(d), plaintiff can only move for a continuance if they establish by sworn declaration (1) there are facts indicating a likelihood that controverting

---

[1] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

United States District Court
Northern District of California

1   evidence exists as to a material fact; (2) specific reasons why such evidence was not discovered or

2   obtained earlier in the proceedings (*i.e.*, "good cause"); (3) the steps or procedures by which the

3   opposing party proposes to obtain such evidence within a reasonable time; and (4) an explanation

4   of how those facts will suffice to defeat the pending summary judgment motion (*i.e.*, to rebut the

5   movant's allegations of no genuine issue of material fact). *Tatum v. City and County of San*

6   *Francisco,* 441 F.3d 1090, 1101 (9th Cir. 2006).

7        Plaintiff makes none of these showings.  Thus, the Court declines Plaintiff's request for

8   continuance of this motion.

9   B.    <u>Probable Cause for § 5150 Detention (Counts 1, 2, 4, 7)</u>

10       Defendants argue they are entitled to summary judgment on Plaintiff's § 1983 claim of

11  violation of the Fourth Amendment (Count 1) because the record shows that Defendants had

12  probable cause to take Plaintiff into protective custody § 5150 of the California Welfare &

13  Institutions Code.  Defendants contend that because they had probable cause under the Fourth

14  Amendment to detain Plaintiff, Defendants are also entitled to summary judgment on Plaintiff's §

15  1983 claim of retaliatory arrest in violation of the First Amendment (Count 2), and state law tort

16  claims for false arrest and detention (Count 4) and negligence (Count 7) because each of those

17  claims depends on a threshold finding that Defendants lacked probable cause.  The Court finds

18  that the summary judgment record does not demonstrate Defendants had probable cause as a

19  matter of law.

20       Under § 5150, an officer may detain any person the officer determines, "as a result of

21  mental disorder, is a danger to others, or to himself or herself, or gravely disabled."  Cal. Welf. &

22  Inst. Code § 5150.  If such a determination is made, the officer may place the person at a county-

23  designated facility for a "72–hour treatment and evaluation."  *Id.*  The officer's determination must

24  be based on probable cause.  *Id.*

25       Probable cause exists under § 5150 if facts are known to the officer "that would lead a

26  person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person

27  detained is mentally disordered and is a danger to himself or herself."  *People v. Triplett,* 144

28  Cal.App.3d 283, 288 (1983).  To justify the detention, the officer must point to "specific and

United States District Court
Northern District of California

6

United States District Court
Northern District of California

articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion." *Id.* "Each case must be decided on the facts and circumstances presented to the officer at the time of the detention and the officer is justified in taking into account the past conduct, character, and reputation of the detainee." *Id.* (citation omitted). An officer "is not required to make a medical diagnosis of mental disorder," rather "generally, mental disorder might be exhibited if a person's thought processes, as evidenced by words or actions or emotional affect, are bizarre or inappropriate for the circumstances." *Id.* Whether probable cause exists is evaluated through the eyes of the officer on the scene at the time of the incident and can incorporate the officer's prior training and experience. *United States v. Fouche*, 776 F.2d 1398, 1403 (9th Cir. 1985).

Defendants argue that the evidence demonstrates Officer Villarroel had probable cause to detain Plaintiff under § 5150 because (1) Plaintiff "was seen screaming near passersby while waiving a metal object in the air," (2) Plaintiff made "agitated and incoherent statements" including about Nazis, and combined with Plaintiff's "frequent gnashing of his teeth and continuing, intermittent outbursts of anger" demonstrated he was a "danger to himself or others due to a mental health disorder." MSJ at 10, 13; *see also* Docket No. 43 ("Reply") at 7 ("plaintiff seemed paranoid and angry, and became verbally combative"); *id.* ("Plaintiff repeatedly went on nonsensical, non-linear rants uttering appeared to be delusional comments and imagery of a violent, sexual, religious and racist nature for no apparent reason.").

Defendants' argument, however, relies on an incomplete and selective characterization of the record evidence. Indeed, Defendants' articulation of the factual bases for its motion for summary judgment cites *exclusively* to the declarations of officer defendants. The Court is obligated to view the record evidence in the light most favorable to Plaintiff and make all justifiable inferences in Plaintiff's favor. The record as a whole reveals there are triable issues of disputed material facts that are central to the determination of probable cause.

First, Defendants rely heavily on the notion that Plaintiff was seen screaming near passersby while swinging a metal object in the air to justify Officer Villarroel's apprehension of Plaintiff and the Officer's ultimate determination that Plaintiff posed a danger to himself or others

United States District Court
Northern District of California

1   that justified detention under § 5150.  However, the *only* source in the record for the assertion of

2   danger is Officer Villarroel's declaration.  *See* Docket 38-3 ("Villarroel Decl.").  Villarroel states,

3   "I saw and heard Mr. Worthy screaming near passersby while swinging a metal object in the air."

4   *Id.* ¶ 4.  "I saw a woman with a stroller and also a man and woman that appeared to be together

5   that were in close proximity to Mr. Worthy."  *Id.*  "The woman and the couple all seemed alarmed

6   and hurriedly walked away from Mr. Worthy."  There is no evidence in the record that anyone else

7   observed these events.  *Cf.* Docket No. 38-2 ("Turney Decl.") ¶ 8 ("I was not present during the

8   beginning of the incident when Mr. Worthy was reportedly waiving his flute and screaming at

9   passersby.").

10          Plaintiff's deposition testimony disputes Villarroel's account of Plaintiff's behavior prior

11   to being stopped by the officers.  In contrast to Villarroel's characterization of Plaintiff screaming

12   and swinging a metal object, Plaintiff testified at his deposition that he was on his typical daily

13   walk in the neighborhood "blowing my flute and walking and singing, just blowing my flute and

14   walking down the center of the parking strip."  Docket No. 42-8 ("Worthy Depo.") at 28:10-12.

15   Plaintiff states that he was walking and playing his flute at a highway underpass because he had

16   not "had any flute lessons," but had "learned to make noise out of it" and he wanted to "stay by

17   himself" when he played it because he did not "want to hurt people's ear with the noise [he]

18   make[s]."  *Id.* 28:20—29:1.  Accordingly, Plaintiff states that in the three minutes before he was

19   stopped by police, "there was no one there" in the vicinity "but [him]" and he did not observe any

20   pedestrians in the immediate area.  *Id.* at 33:1—34:8.

21          Furthermore, the 40-minute video of body camera footage of Plaintiff's encounter with

22   Officer Defendants was filmed on Officer Turney's bodycam; Turney did not arrive to the scene

23   until *after* Officer Villarroel purportedly observed Plaintiff screaming, waving a metal object and

24   scaring passersby.  *Id.* ¶¶ 7-8.  By the time the video footage begins, there are no pedestrians

25   visible anywhere in the vicinity.  Bodycam Footage at 00:00-00:20.  Around the ten-second mark

26   one person is visible sitting on a bench in a plaza to the left of the screen, across the street from the

27   median where Plaintiff and Defendants are.  *Id.* at 00:10.  His back is turned to the scene.  *Id.*

28   Additionally, the first 30-seconds of the bodycam footage does not include any audio.  *Id.* at

1   00:00-00:30.

2       The Court is left with two fundamentally different descriptions of the factual circumstances

3   leading up to Defendants' stop, questioning and ultimate detention of Plaintiff.  On summary

4   judgment, the facts must be construed in the light most favorable to Plaintiff.

5       Accordingly, the Court must look to the evidence on the video to determine whether, in

6   light of Plaintiff's alleged facts preceding the video, there was probable cause based on the

7   interaction captured by the footage.  Defendants argue that they had probable cause to detain

8   Plaintiff under § 5150 because his "agitated and incoherent" statements supported their conclusion

9   that he suffered from a mental disorder and that he posed a danger to himself or others.  MSJ at

10  10, 13.  Defendants describe Plaintiff's statements as "nonsensical, non-linear rants," which

11  "appeared to be delusional" and had a "violent, sexual, religious and racist nature for no apparent

12  reason."  Reply at 7.  Defendants' description of the footage is problematic in several ways.

13      First, it elides the context Plaintiff's emotions: Defendants apprehended Plaintiff from

14  behind while pointing a weapon – apparently a taser – at him, for what Plaintiff contends started

15  as innocent, non-threatening conduct.  *See* Bodycam Footage at 00:00-00:20.  As the video begins,

16  from the point-of-view of Officer Turney, the footage shows that Turney is holding a long-

17  barreled weapon in his right hand.  *Id.*  The footage shows Plaintiff walking slowly along the

18  parking median when Officers Villarroel and Turney approach him from behind.  *Id.*  There is no

19  audio in the first thirty seconds of the video, however, within the first five seconds, it appears that

20  the officers say something to Plaintiff, causing him to stop walking and turn around to face them.

21  *Id.*  When Plaintiff turns to face the officers, and thus the camera, he appears upset and takes a few

22  steps to approach the curb of the sidewalk and sits down in front of the officers.  *Id.*  It appears

23  that through the first 20 seconds of the video, Officer Turney had the weapon pointed at Plaintiff,

24  because at 00:20, the footage shows Turney moving the taser down in the view of the camera,

25  lowering it from a position that was previously above and out of view from the camera to a

26  position below and to the side of the camera.  *Id.*

27      Plaintiff's deposition testimony aligns with the visuals in the footage, as he stated that the

28  officers told him, "they were going to tase me if I didn't put down my flute."  Worthy Depo. at

United States District Court
Northern District of California

1   42:25—43:01; *id.* at 47:21-24 ("I was told if I didn't put down my flute there were going to tase

2   me. Really?  So I put the flute down.  I don't want to be tased.  I don't need that.").  Further,

3   Plaintiff states, "Officer Turney has a taser on—from his video we see the barrel of the taser, we

4   see the handle of it at 23 seconds, the whole taser.  On the other [officer], we see the taser on his

5   back."  *Id.* at 44:11-20.

6         Understanding the context that Plaintiff, an elderly African-American man, was

7   apprehended from behind by police officers pointing tasers at him on an empty street where he

8   was taking his daily walk, is relevant to making a judgment about whether Plaintiff's response to

9   Defendants was "agitated and incoherent," "nonsensical and nonlinear," MSJ at 10, 13, which

10   evidenced mental disorder and danger  or was instead a rational expression of fear and frustration

11   grounded in history and lived experience.  Viewed in Plaintiff's favor, Defendants'

12   characterization are not accurate.

13         Second, a review of the video reveals the encounter differs from the way Defendants

14   characterize it.  Despite his use of profanity, insults and extreme language (*e.g.*, "All the people

15   here have been genocided.  All of them.  All of the people right here.  There was an Indian village

16   here.") (calling the officers "Nazis"), Plaintiff's responses are coherent and lucid and he is able to

17   engage in the ebb and flow of conversation with the officers.  Although he uses profanity at times,

18   Plaintiff repeatedly asks permission to be released so he can finish his walk.  *Id.* at 4, 6, 7, 23-24

19   ("Hey, you cannot fucking hold me for no reason, motherfucker.  You cannot detain me for no

20   reason.  So you give me a reason or let me fucking be on my way, motherfucker."), 30 ("Well,

21   what are you going to do, just hold me here forever?").  When the officers refuse to do so, Plaintiff

22   expresses frustration and his fear at being targeted on the basis of his race.  *Id.* at 7-8.  The officers

23   do not explain why they are detaining him until approximately nearly 40 minutes into the video

24   when Villarroel states, "I'm taking you for an examination by a mental health professional at Alta

25   Bates."  *Id.* at 45.

26         Even if Plaintiff's animated, provocative and, at times, antagonistic behavior gave rise to a

27   strong suspicion that Plaintiff may have had a mental disorder, it did not establish probable cause

28   to believe that he was a *danger* to himself or others as required under § 5150.  Plaintiff stayed

United States District Court
Northern District of California

1    seated on the sidewalk for over ten minutes before he was handcuffed, and complied with the

2    officers' requests that he turn over his identification and flute.  Nor did Plaintiff resist the

3    handcuffing.  Plaintiff did not threaten the officers and was not physically aggressive.  Notably, in

4    the ten minutes before deciding to handcuff Plaintiff, Defendants had the opportunity run his name

5    to check to see Plaintiff had a prior history of involuntary commitment or criminal history.

6    Defendants produced no evidence that they had any knowledge of any such record in Plaintiff's

7    background which would have suggested a threat to safety.

8        Defendants' decision to 5150 the Plaintiff was not irrevocable after they handcuffed him.

9    They spent an additional 28 minutes with Plaintiff after he was handcuffed before Officer

10   Villarroel finally told Plaintiff that he would be detained for a mental health examination and the

11   officers transported Plaintiff from the scene to the hospital for mental health evaluation.  Plaintiff

12   remained seated peacefully on the sidewalk while handcuffed.  During that time, Defendants asked

13   whether Plaintiff suffered from any mental illnesses or had used drugs – to which Plaintiff

14   answered no.  Transcript at 17, 34.  Over those 28 minutes, Plaintiff made no attempts to evade

15   Defendants, did not make any sudden gestures or direct any physical action towards Defendants or

16   others.  He told Defendants he was a property owner in Berkeley and that he had completed a

17   master's thesis at the University of California at Berkeley.[2]  He did not threaten Defendants or

18   anyone else with violence.  Nor did Plaintiff express any intent to harm himself.  *See e.g.*,

19   Transcript at 20, 33.

20       On this record, there is insufficient evidence to conclude there was a strong suspicion that

21   Plaintiff was a danger to himself or others.  Thus, as a matter of law, there was no probable cause

22   to detain him under § 5150.  *Cf. Heater v. Southwood Psychiatric Ctr.*, 49 Cal. Rptr. 2d. 880, 884,

23   887–88 (1996) (finding probable cause under section 5150 where the appellant was in an

24   "agitated," "volatile" state and entertained homicidal and suicidal thoughts); *Triplett*, 192 Cal.

25   Rptr. at 540–41 (holding probable cause under section 5150 where the appellant was intoxicated

26   and weeping, and there were signs of a suicide attempt).

27   

28   [2] Plaintiff confirmed at his deposition that he has two master's degrees from Berkeley – in
     architecture and in city and regional planning.  Worth Depo at 19:01-07.

United States District Court
Northern District of California

11

1    Viewing the evidence in Plaintiff's favor, Defendants did not have probable cause to detain

2    Plaintiff under § 5150.  Accordingly, the Court finds that Defendants are not entitled to summary

3    judgments on Counts 1 (§ 1983 claim in violation of the Fourth Amendment), 2 (§ 1983 claim for

4    retaliatory arrest in violation of the First Amendment), 4 (false arrest) and 7 (negligence).

5    C.    Qualified Immunity – Officer Villarroel (Count 1)

6    Defendants argue that even if the evidence in the record does not demonstrate probable

7    cause to detain Plaintiff under § 5150, Officer Villarroel is, nonetheless, entitled to summary

8    judgment on Count 1 because he is entitled to qualified immunity from liability under § 1983

9    because a reasonable officer could have believed that probable cause existed to detain Plaintiff.

10   "In deciding whether Defendants are entitled as a matter of law to qualified immunity, [the

11   Court] must accept the facts in the light most favorable to the Plaintiffs and then determine

12   whether, in light of clearly established principles governing the conduct in question, the officers

13   objectively could have believed that their conduct was lawful."  *Mena v. City of Simi Valley,* 226

14   F.3d 1031, 1036 (9th Cir. 2000).

15   In determining whether Officer Villarroel is entitled to qualified immunity, the Court must

16   ask two questions: "'(1) Was the law governing the officer's conduct clearly established? (2)

17   Under that law, *could a reasonable officer* believe that the conduct was lawful?'"  *Case v. Kitsap*

18   *County Sheriff's Dep't,* 249 F.3d 921, 926 (9th Cir.2001) (quoting *Mena,* 226 F.3d at 1036)

19   (emphasis added); *see also Anderson v. Creighton*, 483 U.S. 635, 636–37 (1987) (holding that a

20   "law enforcement officer who participates in [conduct] that violates the Fourth Amendment may

21   [not] be held personally liable ... if a reasonable officer could have believed that the [conduct]

22   comported with the Fourth Amendment"); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061

23   (9th Cir. 2006) (explaining that "it may be difficult for a police officer to determine how to apply

24   the relevant legal doctrine to the particular circumstances he or she faces ... if an officer makes a

25   mistake in applying the relevant legal doctrine, he or she is not precluded from claiming qualified

26   immunity so long as the mistake is reasonable").

27   Only the second prong of the qualified immunity analysis is at issue in this matter.  There

28   is no dispute that Plaintiff's constitutional right to be free from detention without probable cause

United States District Court
Northern District of California

12

was clearly established prior to 2019 when the incident at issue took place.  *See Bias*, 508 F.3d at 1220 (citing *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991) ("Although there are few decisions that discuss the fourth amendment standard in the context of seizure of the mentally ill, all have recognized the proposition that such a seizure is analogous to a criminal arrest and must therefore be supported by probable cause.")).[3]

For the second prong of the qualified immunity analysis, "if officers of reasonable competence could disagree" about the existence of probable cause, "immunity should be recognized."  *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986).  "Framing the reasonableness question somewhat differently, the question in determining whether qualified immunity applies is whether all reasonable officers would agree that there was no probable cause in this instance."  *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1078 (9th Cir. 2011) (citation omitted).  Here, Defendants argue that even if Plaintiff can "raise a question of fact on whether Officer Villarroel had probable cause to 5150 Plaintiff. . . Officer Villarroel had 'arguable probable cause,'" which entitles him to qualified immunity.  MSJ at 14.  Based on the evidence in the summary judgment record, the Court disagrees.

The analysis proceeds from the same facts regarding probable cause discussed above.  Recall an officer may detain any person the officer determines, "as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled."  Cal. Welf. & Inst. Code § 5150.  Probable cause exists under § 5150 if facts are known to the officer "that would lead a person of ordinary care and prudence to believe, or to entertain a strong suspicion, that the person detained is mentally disordered **and** is a danger to himself or herself" or others.  *Triplett*, 144 Cal.App.3d at 288 (emphasis added). To justify the detention, the officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion."  *Id.*

Although there arguable is sufficient evidence to establish a reasonable officer could

_____

[3] Defendants do not argue that Plaintiff's right to be free from detention without probable cause was not clearly established.  Thus, the Court need not examine this prong of the qualified immunity analysis.

believe that Plaintiff was mentally disordered, there is not sufficient evidence upon which Officer Villarroel could reasonably conclude there was a "strong suspicion" that Plaintiff *posed a danger to himself or others*.  As noted above, for purposes of determining qualified immunity on Defendants' motion for summary judgment, the Court must assume there was no conduct by Plaintiff indicating any threat of danger to anyone prior to the start of the footage.  Viewing the rest of the evidence (the footage) in the light most favorable to Plaintiff, for the reasons previously stated, it is clear Plaintiff posed no threat to himself or others.  It is not surprising that upon his 5150 admission, medical authorities agreed.

Villarroel relies heavily on the Ninth Circuit's holding in *Bias v. Moynihan* that officers were entitled to qualified immunity.  There, the court held it was reasonable to conclude the officers had probable cause to detain the plaintiff under § 5150 where there were *undisputed* facts that the plaintiff wrote a letter to a Judge "stating that she would kill herself if the court ruled against her," when "asked if she was going to hurt herself" by a police officer, "she responded that she would do 'whatever' she wanted," and plaintiff stated "that she feared that a terrorist was trying to kill her."  508 F.3d 1212, 1220 (9th Cir. 2007).  The Court also held that an officer was entitled to qualified immunity for his detention of the plaintiff under § 5150 a year later, where that officer personally "recalled Ms. Bias's disturbing behavior" a year earlier, and witnessed plaintiff "became combative and began grabbing" the officer, plaintiff's "neighbor reported" that plaintiff was "constantly accusing her of plotting to ruin [plaintiff's] life," and plaintiff told the officer that "her neighbors were out to get her."  *Id.* at 1221.

The facts of *Bias* are far from the circumstances here.  First, given the factual dispute on this record, the Court must assume there was no predicate threatening conduct, unlike in *Bias*.  Second,  Plaintiff was never physically combative against the Villarroel or the other officers; he never grabbed any of the officers. By contrast, Plaintiff sat on the sidewalk for forty-minutes surrounded by three officers and did not threaten nor make any physical gestures of violence against the officers.  Third, Plaintiff never indicated any thoughts or actions towards suicide or an inclination to harm others either before or during the incident.  Fourth, Villarroel had no background information about nor any prior encounters or experiences with Plaintiff which

indicated a potential danger to safety.  These factors, present in *Bias*, are missing here.

Thus, considering the facts in the summary judgment record in the light most favorable to Plaintiff, the Court concludes all reasonably competent officers in Officer Villarroel's position could not have reasonably concluded that Plaintiff presented a threat danger to himself or others. *Cf. Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("Considering the facts in the light most favorable to Rosenbaum, all reasonably competent officers would have agreed that he was not committing a crime" where the facts do not establish the elements of any crime under Nevada law).

This case stands in contrast to the many cases involving on the street actions by officers, where the court's "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  Qualified immunity has particular force in those circumstances.  But this case does not present a situation where Officer Villarroel was required to make "split-second judgments."  The video footage demonstrates that Officer Villarroel spent over ten minutes to engage verbally with Plaintiff while Plaintiff was seated on the sidewalk before Villarroel issued the command to handcuff Plaintiff. Office Villarroel then had another 28 minutes to engage with a seated and handcuffed Plaintiff before finally removing Plaintiff from the scene and transporting him to the hospital to complete the § 5150 detention.  Indeed, as noted above, Defendants had time to run a records check on Plaintiff after obtaining his identification.  In short, Officer Villarroel had substantial time to analyze and assess the situation.

Accordingly, the Court denies summary judgment to Officer Villarroel on Count I because he is not entitled to qualified immunity from liability on this claim as a matter of law.

D.     <u>Qualified Immunity – Officers Turney and Walther (Counts 1 and 2)</u>

Defendants argue that Officers Turney and Walther are entitled to qualified immunity from liability on Plaintiff's § 1983 claims (Counts 1 and 2), because they reasonably relied on Officer Villarroel's statements that Plaintiff posed a danger and, thus, had probable cause to detain Plaintiff under § 5150.  MSJ at 15-16.

United States District Court
Northern District of California

1    This is a close question.  The Court finds that Officers Turney and Walther are entitled to

2    qualified immunity from Plaintiff's § 1983 claims (Count 1, under the Fourth Amendment, and

3    Count 2, under the First Amendment).

4    In contrast to Office Villarroel who could base his decision on his own direct and personal

5    observations, it is undisputed that the factual basis for Officers Turney and Walther's

6    determination that Plaintiff posed a danger was informed by Officer Villarroel's description of

7    what occurred before they arrived at the scene.  Turney Decl. ¶ 3 ("I received a broadcast from

8    Officer Villarroel regarding an ongoing call at the intersection of 4th Street and University Avenue

9    and I responded as a cover officer."); Docket 38-4 ("Walther Decl.") ¶ 2 ("I received a broadcast

10   on my police radio to act as a cover officer at an ongoing call at the intersection of 4th Street and

11   University Avenue.").  The evidence is undisputed that Officers Turney and Walther did not

12   witness plaintiff's allegedly erratic and threatening behavior near passersby, because they arrived

13   at the scene after that occurred at Officer Villarroel's request.  Turney Decl. ¶ 8 ("I was not

14   present during the beginning of the incident when Mr. Worthy was reportedly waving his flute and

15   screaming at passersby."); Walther Decl. ¶ 3 ("When I arrived at the scene, Officer Villarroel and

16   Officer Turney were standing next to a man I later learned was Richard Worthy who was seated

17   on the curb."), ¶ 6 ("I was not present during the beginning of the incident, and therefore, I did not

18   have all the information which on which Officer Villarroel decided to '5150' Mr. Worthy.").

19   Based on the evidence in the record, Officer Villarroel's observations that Plaintiff was

20   yelling and screaming and *swinging his flute around* before the other officers arrived appear to

21   have been brought to Officer Turney's attention when he arrived at the scene, and to both Officers

22   Turney and Walther as they assisted in effectuating Officer Villarroel's decision to handcuff

23   Plaintiff.  *See e.g.*, Transcript at 3 ("Turney: People are worried because you're screaming out

24   here, okay."), 17 ("Villarroel [in the presence of Turney and Walther]: Richard, it's because

25   you're yelling and screaming, you're swinging your flute around.").  Plaintiff's alleged conduct of

26   swinging his flute around while yelling, suggesting some degree of a physical threat, could

27   provide the basis of a strong suspicion of a danger to others – or, at least a reasonable officer could

28   so conclude.

The Ninth Circuit has held that, "while '[a]ll officers ... have an ongoing duty to make appropriate inquiries regarding the facts received or to further investigate if sufficient details are relayed,'" that "'[w]here an officer has an objectively reasonable, good-faith belief that he is acting pursuant to proper authority, he cannot be held liable if the information supplied by other officers turns out to be erroneous.'" *Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008) (quoting *Motley v. Parks*, 432 F.3d 1072, 1081–82 (9th Cir. 2005) (*overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012)); *see also Motley*, 432 F.3d at 1081-82 ("Effective and efficient law enforcement requires cooperation and division of labor to function . . . We emphasized that an officer 'was entitled to rely on the observations and knowledge of the others, even though some of the critical information had not been communicated to him.'"); *cf. Ramirez v. Butte–Silver Bow County*, 298 F.3d 1022, 1027-28 (9th Cir. 2002) ("The officers who lead the team that executes a warrant are responsible for ensuring that they have lawful authority for their actions. . . Line officers, on the other hand, are required to do much less. They do not have to actually read or even see the warrant; they may accept the word of their superiors that they have a warrant and that it is valid"). "The lynchpin is whether the officer's reliance on the information was objectively reasonable." *Id*.

The Court finds that it was objectively reasonable for Officers Turney and Walther to rely on Officer Villarroel's description of how Plaintiff posed a danger to others, as they had no obvious reason to question Officer Villarroel's observations. To be sure, despite their reasonable reliance on Officer Villarroel's descriptions, Officers Turney and Walther did spend an extended period of time with Plaintiff and observed him seated and compliant (38 minutes for Officer Turney, and 28 minutes for Officer Walther). Officer Villarroel's descriptions are the *only* evidence in the summary judgment record that Plaintiff posed a danger to others. Thus, it is a close call as to whether it was reasonable for Turney and Walther to determine that Officer Villarroel's description of Plaintiff's allegedly threatening behavior *before* they arrived at the scene was sufficient to outweigh their firsthand observations of Plaintiff's *lack* of threatening conduct for the duration of their time at the scene to support their determinations that they probable cause to complete the § 5150 detention. Nonetheless, given their reasonable belief that

1    Plaintiff had engaged in threatening conduct minutes before their arrival provides a basis for

2    qualified immunity.  *See Rosenbaum*, 663 F.3d at 1078.

3         Accordingly, Officers Turney and Walther could reasonably have determined that there

4    was probable cause to detain Plaintiff under § 5150, and, thus, Officers Turney and Walther are

5    entitled to qualified immunity from liability for Plaintiff's § 1983 claim alleging violation of the

6    Fourth Amendment (Count 1).

7         This conclusion also implies Officers Turney and Walther are entitled to qualified

8    immunity on Plaintiff's § 1983 claim for retaliatory arrest in violation of the First Amendment

9    (Count 2).  The Supreme Court held in *Nieves v. Bartlett*, 139 S. Ct. 1714, 1727 (2019) that to

10   bring a First Amendment retaliatory arrest claim, a plaintiff must generally show that there was no

11   probable cause for the arrest.  The *Nieves* Court recognized a narrow exception to this rule "where

12   officers have probable cause to make arrests, but typically exercise their discretion not to do so."

13   *Id.*  Here, Officers Turney and Walther are entitled to qualified immunity on Plaintiff's Fourth

14   Amendment claim because they reasonably concluded there was probable cause to detain Plaintiff.

15   Plaintiff does not advance a theory or any that any Defendants that this was a situation where even

16   if probable cause was present to effectuate the detention, officers "typically exercise their

17   discretion not to do so."  *Id.*  Plaintiff's First Amendment claim rests on his argument that

18   Defendants lacked probable cause – and thus, the detention was pretextual in response to

19   Plaintiff's protected speech.  This theory fails as applied to Defendants Turney and Walther, who

20   are entitled to qualified immunity regarding their determination of probable cause.

21        In sum, based on the summary judgment record, Defendants Turney and Walther are

22   entitled to qualified immunity from liability on Plaintiff's § 1983 claims (Counts 1 and 2).

23   E.    Statutory Immunity from Liability for False Arrest (Count 4)

24        Plaintiff's fourth claim is for false arrest and false imprisonment under state law.  As

25   Defendants acknowledge, the probable cause test for taking a person into protective custody under

26   § 5150 of the California Welfare & Institutions Code is the same as that for warrantless arrest.

27   *People v. Triplett*, 144 Cal.App.3d 283, 287-88 (1983).  However, as explained above, Defendants

28   are not entitled to summary judgment that they had probable cause to detain Plaintiff.

United States District Court
Northern District of California

1    Defendants further argue that they are entitled to statutory immunity from Plaintiff's state

2 law tort claim for false arrest and false imprisonment under Cal. Gov. Code. § 856(a).  MSJ at 14.

3 Cal. Gov. Code § 856(a) provides, in relevant part: "Neither a public entity nor a public employee

4 acting within the scope of his employment is liable for any injury resulting from determining in

5 accordance with any applicable enactment: (1) Whether to confine a person for mental illness. . ."

6 The plain text of § 856(a) applies only to detentions, or decisions made in the process of detention,

7 which are made "in accordance with any applicable enactment," meaning, in this case, in

8 accordance with § 5150 of the California Welfare & Institutions Code.

9    Here, because there is a question of material fact as to whether Defendants had probable

10 cause to detain Plaintiff under § 5150, the Court cannot conclude that the detention was "in

11 accordance with" that section, and thus § 856(a) does not confer immunity on Defendants at this

12 stage in the proceedings.  *See Hall v. City of Fremont*, 520 F. App'x 609, 612 (9th Cir. 2013)

13 ("Because Officer Miskella did not have probable cause to detain Hall under section 5150, the

14 detention was not "in accordance with" that section, and thus neither section 5278 or section

15 856(a) provides immunity for Officer Miskella.").

16    Finally, Defendants' citation to Cal Gov. Code § 855.6 for immunity from Plaintiff's false

17 arrest claim is not applicable either.  Section 855.6 provides:

18          Except for an examination or diagnosis for the purpose of treatment,
            neither a public entity nor a public employee acting within the scope
19          of his employment is liable for injury caused by the failure to make
            a physical or mental examination, or to make an adequate physical
20          or mental examination, of any person for the purpose of determining
            whether such person has a disease or physical or mental condition
21          that would constitute a hazard to the health or safety of himself or
            others.
22

23 Nothing in the plain language of § 855.6 immunizes an officer from effectuating a detention

24 without probable cause and Defendants cite no cases so construing the provision.

25    Thus, Defendants are not entitled to statutory immunity from Plaintiff's false arrest and

26 false imprisonment claim (Count 4) on the summary judgment record.

27 F.    Failure to Present Claims (Counts 3 and 5)

28    Plaintiff's third cause of action is a tort claim for assault and battery.  An arresting officer's

19

1   use of excessive force in the course of a lawful arrest may give rise to civil liability for torts such

2   as assault and battery.  *Yount v. City of Sacramento*, 43 Cal. 4th 885, 899 (2008).

3         Assault is broadly defined as the "unlawful attempt, coupled with a present ability, to

4   commit a violent injury on the person of another."  *Tekle v. United States*, 511 F.3d 839, 855 (9th

5   Cir. 2007) (as amended).  To prevail on a claim of civil assault against a police officer under

6   California law, a plaintiff must establish that "(1) the officers threatened to touch him in a harmful

7   or offensive manner; (2) it reasonably appeared to him that they were about to carry out the threat;

8   (3) he did not consent to the conduct; (4) he was harmed; and (5) the officers' conduct was a

9   substantial factor in causing the harm."  *Id.*  Because police officers are permitted to use

10  reasonable force to effectuate an arrest, liability for civil assault may only arise if the assault

11  resulted from a police officer's use of unreasonable force.  Cal. Penal Code § 835a; *see e.g. Tekle*,

12  511 F.3d at 855 (police officers who pointed guns at Plaintiff while he was sitting in his garage

13  and placed a gun to Plaintiff's head before handcuffed him could be held liable for civil assault).

14        Battery is defined as "any willful and unlawful use of force or violence upon the person of

15  another."  *Tekle*, 511 F.3d at 855. To prevail on a battery claim, a plaintiff must establish that "(1)

16  the defendant intentionally did an act that resulted in harmful or offensive contact with the

17  plaintiff's person, (2) the plaintiff did not consent to the contact, and (3) the contact caused injury,

18  damage, loss or harm to the plaintiff."  *Id.* (citing *Cole v. Doe 1 thru 2 Officers of Emeryville*

19  *Police Dep't*, 387 F. Supp. 2d 1084, 1101 (N.D. Cal. 2005)).  When the battery claim is against a

20  police officer, as here, the plaintiff must also establish that the officer used unreasonable force.

21  *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998).

22        Plaintiff's fifth cause of action is for an alleged violation of Cal. Civ. Code 51.7, which

23  protects and individual's "right to be free from any violence, or intimidation by threat of violence,

24  committed against their persons or property because" of a protected ground including, as relevant

25  here, race.

26        Defendants argue that summary judgment should be granted on Plaintiff's assault and

27  battery common law claim (Count 3) and statutory claim under Cal. Civ. Code 51.7 (Claim 5)

28  because Plaintiff failed to articulate any facts related to these claims in compliance with the claim

United States District Court
Northern District of California

1    presentation requirements under California's Government Claims Act.  Cal. Gov. Code § 900, et

2    seq. ("Claims Act").  Under the Claims Act, "no suit for "money or damages" may be brought

3    against a public entity until a written claim has been presented to the public entity and the claim

4    either has been acted upon or is deemed to have been rejected.  Cal. Govt. Code, §§ 905, 945.4.

5    Compliance with this requirement constitutes an element of a cause of action for damages against

6    a public entity or official.  *State v. Sup. Ct. (Bodde)*, 32 Cal.4th 1234, 1243-344 (2004).  A suit for

7    "money or damages" includes all actions where the plaintiff is seeking monetary relief, regardless

8    whether the action is founded in tort, contract, or some other theory.  *Hart v. Alameda Cnty.*, 76

9    Cal.App.4th 766, 778–79 (1999) (citation omitted).

10        In addition, "the factual circumstances set forth in the written claim must correspond with

11   the facts alleged in the complaint; even if the claim were timely, the complaint is vulnerable to a

12   demurrer or motion for judgment on the pleadings if it alleges a factual basis for recovery which is

13   not fairly reflected in the written claim."  *Fall River Joint Unified Sch. Dist. v. Superior Court*,

14   206 Cal.App.3d 431, 434 (1988).  Similarly, in *Gong v. City of Rosemead*, 226 Cal.App.4th 363,

15   376 (2014), the court held that any cause of action that is not "fairly reflected" in the pre-lawsuit

16   claim is barred under the Claims Act.

17        Here, Plaintiff's pre-lawsuit claim states:

18            I was walking on the sidewalk playing my flute.  A Berkeley Police
             Officer saw me and demanded my identification; I declined to give
19            my identification.  He arrested me without probable cause and
             falsely accused me of being mentally ill.  He had me taken to Alta
20            Bates Hospital, deprived me of my liberty and caused me to have a
             record of mental health that will negatively affect me for the rest of
21            my life.

22   Docket No. 38-1, Exh. A.  Plaintiff' pre-lawsuit claim does not make any mention of use of force,

23   let alone excessive or reasonable force, intimidation, violence, threat of force or threat of violence.

24   Additionally, Plaintiff's pre-lawsuit claim does not include any allegations of misconduct based on

25   racial animus.  There must be some allegations in Plaintiff's pre-lawsuit claims that "correspond"

26   to the elements of Counts 3 and 5 in order for Plaintiff to pursue these claims in court.  *See Fall*

27   *River*, 206 Cal.App.3d at 434.

28        Plaintiff does not respond to Defendants' argument that Counts 3 and 5 are barred by

United States District Court
Northern District of California

1   Plaintiff's failure to present them in his pre-lawsuit claim.  Elsewhere though, Plaintiff contends

2   that Defendant's use of handcuffs while detaining Plaintiff was unreasonable.  Opp. at 9.  From

3   this argument, the Court might infer that because Plaintiff mentioned he was "arrested without

4   probable cause" and because Count 3 and 5 relate to the circumstances of his arrest, his pre-

5   lawsuit claim is sufficient for him to pursue Count 3 and 5.

6        But such a reading would be a stretch.  The pre-lawsuit claim does not make *any* mention

7   of Defendants' use of handcuffs while effectuating the arrest nor does it allege any other actions

8   taken during the arrest that could be inferred to allege a use of unreasonable or excessive force as

9   required for the assault and battery claims.  And nothing in the pre-lawsuit claim connects the dots

10  for an allegation of racial animus that is core to Plaintiff's claim on Count 5.  Therefore, the pre-

11  lawsuit claim does not "fairly reflect" the causes of action in Counts 3 and 5 here, and, therefore,

12  those claims are barred under the Claims Act.  *See Fall River*, 206 Cal.App.3d at 434.

13       Thus, Defendants are entitled to summary judgment on Counts 3 and 5.

14  G.   Sufficiency of Evidence for Cal. Civ. Code § 52.1 (Count 6)

15       Plaintiff's sixth cause of action arises from Cal. Civ. Code. § 52.1, which provides, in

16  relevant part, that a police officer may not use a "threat, intimidation, or coercion" to interfere

17  with the exercise of a person's constitutional right.

18       For arrest or detention cases, "Wrongful arrest or detention, without more, does not satisfy

19  both elements of section 52.1."  *Allen v. City of Sacramento*, 234 Cal.App.4th 41, 69 (2015).  A

20  claim under § 52.1 "requires a showing of coercion independent from the coercion inherent in the

21  wrongful detention itself."  *Shoyoye v. Cty. of Los Angeles*, 203 Cal.App.4th 947, 959 (2012); *see*

22  *also Quezada v. City of L.A.*, 166 Cal.Rptr.3d 479, 491 (2014) ("The coercion inherent in

23  detention is insufficient to show a Bane Act violation."); *Galindo v. City of San Mateo*, No. 16-

24  CV-03651-EMC, 2016 WL 7116927, at *6 (N.D. Cal., Dec. 7, 2016) (holding that under Section

25  52.1, "in the case of an arrest, the threat, intimidation or coercion must be some more than that

26  necessary to effect an arrest.") (citing *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir.

27  2015)).  These standards are equally applicable to the context of a detention under § 5150 of the

28  California Welfare & Institutions Code.  *See Julian v. Mission Community Hospital,* 11

1  Cal.App.5th 360, 395 (2017).

2      Plaintiff neither identifies evidence in the record of coercion in support of his claim under

3  Cal. Civ. Code. § 52.1, nor does he address the cases that hold that coercion inherent in the alleged

4  wrongful arrest or detention is insufficient to sustain a claim under § 52.1.  He cites nothing

5  beyond the coercion inherent in the wrongful detention itself.  Thus, Defendants are entitled to

6  summary judgment on Count 6.

7  H.    Substantiative Due Process and *Monell* Liability Claims Not Plead

8      Plaintiff's opposition brief argues that his claims for violations of substantive due process

9  under the Fourteenth Amendment and supervisory liability claim under *Monell* should be allowed

10  to proceed.  Opp. at 10-13.  However, it is not clear what claims Plaintiff is referring to, as the

11  complaint does not include a due process claim nor of theory of *Monell* liability.  *See* Docket No.

12  1.  Thus, there is no basis for these claims.

13                      **V.    CONCLUSION**

14      For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants'

15  motion for summary judgment,[4] as follows:

16      •  Summary judgment is **granted** to all Defendants on Counts 3, 5 and 6 and to

17         Defendants Turney and Walther and Counts 1 and 2.

18      •  Summary judgment is **denied** to all Defendants on Counts 4 and 7 and to

19         Defendant Villarroel on Counts 1 and 2.

20  This order disposes of Docket No. 38.

21      **IT IS SO ORDERED**.

22

23  Dated: November 23, 2021

24                              _____

25                              EDWARD M. CHEN
                                United States District Judge
26

27  ───────────────────────
   [4] Defendants filed objections to portions of Plaintiff's evidence entered on the summary judgment
28  record.  Docket Nos. 44, 47.  The Court does not rely on any of the objected-to evidence, and,
   thus, does not address Defendants' objections.

United States District Court
Northern District of California